IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KPEL HOLLINS,<br><br>Defendant. | Case No. 16-cr-00744-DKW-8<br><br>**ORDER DENYING DEFENDANT KPEL HOLLINS' MOTION TO SUPPRESS EVIDENCE** |

On October 9, 2018, Defendant Kpel Hollins moved to suppress all evidence recovered following the execution of a search warrant on his vehicle.[1] Dkt. Nos. 514, 514-1, 514-4. Hollins principally moves for suppression on the ground that the law enforcement search was conducted without a warrant and without probable cause. On October 19, 2018, the government filed an opposition to the motion to suppress, Dkt. No. 535, to which Hollins replied, Dkt. No. 541. Hollins submitted a law enforcement surveillance video of his vehicle as part of his briefing. Dkt. No. 546. Although an evidentiary hearing was originally scheduled on the motion to suppress, after discussion with counsel and with no witnesses having been designated, the Court vacated the hearing. Dkt. No. 537. Having reviewed the

---

[1] While Hollins' motion also appears to seek the exclusion of evidence seized from a subsequent search of his residence (*see* Dkt. No. 514-4 at 2-3), his motion focuses only on the search of his vehicle. The search of his residence is not separately discussed.

video in toto, the parties' memoranda, the record, and the relevant legal authorities, the Court DENIES the Motion to Suppress Evidence for the following reasons.

## LEGAL STANDARD

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. Amend. IV. "Searches and seizures that offend the Fourth Amendment are unlawful and evidence obtained as a direct or indirect result of such invasions is considered fruit of the poisonous tree and is inadmissible under the exclusionary rule." *United States v. McClendon*, 713 F.3d 1211, 1215 (9th Cir. 2013) (quotation omitted). The "ultimate touchstone" in such an inquiry is "reasonableness." *Riley v. California*, 134 S.Ct. 2473, 2482 (2014).

Generally, when a search is performed by law enforcement officers, reasonableness requires a judicial warrant. *Id*. There are, however, specific exceptions to the warrant requirement. *Id*. As both parties acknowledge in their memoranda, one such specific exception concerns automobiles. More specifically, "the search of an automobile can be reasonable without a warrant" due to the "ready mobility" and "pervasive regulation" of automobiles. *Collins v. Virginia*, 138 S.Ct. 1663, 1669-70 (2018) (quotations omitted). "When these justifications for the automobile exception come into play, officers may search an automobile without

having obtained a warrant so long as they have probable cause to do so." *Id*. at 1670 (quotation omitted).[2]

Probable cause "means a fair probability that contraband or evidence is located in a particular place." *United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007) (quotation omitted). "Whether there is a fair probability depends upon the totality of the circumstances, including reasonable inferences, and is a commonsense, practical question." *Id*. (quotation omitted). "Neither certainty nor a preponderance of the evidence is required." *Id*.

## **DISCUSSION**

Hollins argues that the Fourth Amendment was violated because law enforcement searched his vehicle without a warrant and without probable cause. Hollins further challenges the veracity of a search warrant affidavit used to procure a subsequent search of his vehicle on the ground that it omitted information about the earlier warrantless search. Hollins also argues that the search warrant affidavit erroneously asserted that he "resided together" with Conleysha Gaston.[3]

---

[2]Hollins does not argue that the justifications for the automobile exception are not in play. Indeed, along with the government, he focuses on whether probable cause existed for the search of his vehicle. As a result, the Court does the same.

[3]Gaston is a co-defendant in this case. Hollins fails to explain how residing together with Gaston, whether or not true, "would support the issuance of the search warrant" or why the warrant would not have issued had the issuing judge known that Hollins and Gaston did not "reside together." Because the relevance and import of this alleged misstatement in the affidavit is not evident to the Court, and has not been explained by Hollins, the Court does not address this further, except to reject this argument as a basis for suppressing the evidence in the manner urged by Defendant.

Hollins principally argues that (1) an initial search of his car occurred without a warrant and without probable cause, and (2) law enforcement omitted from a subsequent search warrant affidavit the fact that a warrantless search had occurred. Although Hollins does not assert that any evidence he seeks to suppress was obtained during the initial search, he argues that the evidence obtained as a result of executing the search warrant should be suppressed because the initial search helped law enforcement "gather further information" resulting in the search warrant application.

As an initial matter, Hollins' argument is noticeable for what it does not identify: the "further information" law enforcement gathered during the initial search that helped or caused them to obtain a search warrant. After all, if the initial search did not prompt the application for a search warrant, the search warrant can hardly be described as tainted by that search. *See United States v. Hill*, 55 F.3d 479, 481 (9th Cir. 1995) ("To be untainted by [a] prior search, the officers' decision to seek the warrant must not have been prompted by what they had seen during the earlier unlawful search."); *see also Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (explaining that the appropriate question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.") (quotation omitted). Hollins'

failure to identify the "further information" that supposedly prompted the search warrant application dooms his arguments for suppression based upon the illegality of the initial search and its omission from the affidavit. This is especially the case where, as here, the government argued in opposition that the search warrant application was not based upon the initial search, and Hollins entirely ignored this argument in reply.

As important is Hollins' argument that probable cause did not exist for the initial search. This contention is primarily based upon Hollins' characterization of the video evidence. Hollins argues the video shows that officers surveilling his vehicle were "uncertain[] as to whether Gaston had left a package in the vehicle." According to Hollins, "[t]he special agents specifically discussed entering the vehicle to confirm the presence of the white bag." In reply, Hollins goes further, arguing that the officers were "excitedly unsure" about whether a drug transaction had taken place and there was "near panic in their voices" as they expressed doubt about what they had just observed. In Hollins' eyes, the video shows that none of the officers knew what Gaston had done in the course of entering and then exiting Hollins' vehicle.

Having reviewed the entirety of the video, the Court finds that Hollins' characterizations of the same are wildly inaccurate. In pertinent part, the video shows the following. Gaston was sitting in the driver's seat of a car parked directly

in front of Hollins' parked vehicle. Gaston exited out of the driver's door of her car, walked around the front of her car, and opened the back passenger door of her car. At this point, the video does not show anything in Gaston's hands. Gaston then leaned into her car, leaned back out, and turned to face Hollins' vehicle. At this point, there is clearly a white bag in Gaston's left hand, which she switches to her right hand. Gaston then walks to Hollins' vehicle, opens the front passenger door, and sits down in the front passenger seat. Other than Gaston, there is no one in Hollins' evidently unlocked vehicle. The video does not show with specificity what it is Gaston does while sitting in Hollins' vehicle, but she is seen fiddling with or moving things around the center console. Gaston then exits the front passenger side of Hollins' vehicle and opens the back passenger door of the same vehicle. Gaston looks into and then leans into the back passenger side of Hollins' vehicle. During this process, both of Gaston's hands can be seen. Nothing is contained in either. Gaston then leans out of Hollins' vehicle and closes the back passenger door with her empty right hand. Gaston then walks toward and around the front of Hollins' vehicle. As she does so, her left hand is visible. There is nothing contained in her left hand. Gaston then enters her car.

In this light, the video clearly shows that Gaston left the white bag at issue in Hollins' vehicle because it was in her hands when she approached and entered it, but the white bag was not in her hands when she exited. What then of the officers'

6

reaction, on which Hollins places so much emphasis?  There are two officers. After Gaston re-enters her car, one of the officers (whom the Court will call the "first officer") says, "Her hands are empty.  Her hands are empty yeah?"  The other officer (whom the Court will call the "second officer") says, "I couldn't see the hands."  At this point, "the guy" arrives on the scene, and the first officer states that "the guy" appears to be saying something to Gaston.  "The guy" then walks away, and Gaston drives away.  The first officer then states that "the guy" is "Kaps." "Kaps" is another name for Hollins.  The first officer then says that Hollins did not go back to his vehicle, "so the package should still be in his car."  In a subsequent video clip, Hollins can be seen opening his vehicle after Gaston drives away. Hollins leans into his vehicle, returns to an upright position outside of the vehicle, and then closes the door.  As Hollins walks away, he can be seen carrying a black bag.  The first officer then says, "I don't think he's going to take the whole."  In the next video clip, the first officer says, "If the car's not locked, we can go through real fast and see."  There are no further pertinent statements from the officers before another individual, who is presumably an undercover officer, opens the back passenger door of Hollins' vehicle and looks in without entering.  Two to three seconds after opening the door, the undercover officer closes it and walks away. The first officer then says, "But he looked to see if the bag was in there?"  The second officer responded affirmatively that the undercover officer had looked.  In

7

the final video clip, the first officer states that Hollins will not sell the "whole three keys at work" and there is a "good chance" Hollins will have "at least a pound or two left when he leaves later." The first officer then says that it would be an "option" "to stop and grab that bag later," but it is not his decision. As it relates to the instant motion to suppress, that is the end of the video.

Contrary to Hollins' arguments, the officers are never brought to near panic or excitement about whether Gaston left a bag in Hollins' vehicle. Instead, the first officer matter-of-factly states that Gaston's hands were empty when she exited Hollins' vehicle. Although the first officer then phrased the same statement as a question to his colleague, there is no doubt or uncertainty conveyed. Moreover, the second officer's statement that he could not see Gaston's hands was delivered with frustration, not panic. The mere fact that the second officer could not see Gaston's hands does not mean he believed Gaston had something in her hands when she returned to her car. To the extent there was any doubt about the officers' understanding, the first officer made things clear when he said that, because Hollins did not go toward his car after talking to Gaston, "the package should still be in his car." The Court finds that this evidence alone refutes Hollins' contentions that the officers were uncertain about whether Gaston left a package in Hollins' vehicle.

Subsequent events only clarify matters further. Notably, the only time that uncertainty creeps into one of the officers' voices is when, after Gaston has driven

8

away, Hollins returns to his vehicle and carries away a black bag. The first officer says, "I don't think he's going to take the whole." Only then is the idea floated of opening Hollins' unlocked vehicle. In this light, contrary to Hollins' contentions, the officers were uncertain about whether *Hollins* had taken the package Gaston left, not if *Gaston* had left the package in the first place. The final video clip provides further confirmation of this, in light of the first officer's statements about Hollins likely not selling the whole package at work. Obviously, the first officer would not have made this statement if he did not think the package had been left in Hollins' vehicle.[4]

As far as the Court is concerned, therefore, the evidence shows and the officers believed that Gaston left a white bag in Hollins' vehicle. Obviously, standing alone, leaving a white bag in another person's car does not mean that law enforcement had probable cause to search that vehicle for evidence of a crime. The video evidence discussed above, however, was just one part of the evidence used in the search warrant affidavit. The affidavit also relied to a great extent on numerous telephone conversations and/or text messages between Hollins and Jeremiah Ieremia.[5] Hollins spends little time discussing these telephone conversations and

---

[4] Given that the initial search occurred before the first officer's statements in the final video clip, the argument could be made that the first officer only reached his conclusion about Hollins' sale strategy after he learned what the initial search uncovered. Such an argument would be much easier to make, of course, if Hollins had identified the information uncovered by the initial search. Because he does not, the Court does not address this matter further.
[5] Ieremia is another co-defendant in this case.

9

text messages, briefly arguing in reply that law enforcement's interpretation of them was speculative.

The Court has fully reviewed the telephone conversations and text messages set forth in the search warrant affidavit, and there is nothing speculative about the belief that they indicate Ieremia and Hollins were arranging a meeting between Gaston and Hollins in order to conduct a drug transaction. In light of the officers' training and experience, the Court does not question their more than reasonable interpretation of that which Hollins and Ieremia were discussing.[6] In addition, there is simply no evidence supporting Hollins' assertion that law enforcement only conducted surveillance of his vehicle because they were unsure if a drug transaction would take place. Instead, Hollins' vehicle was surveilled because the telephone conversations and text messages gave law enforcement a reasonable and specific belief that a drug transaction would take place at a particular time and location near Hollins' place of work. In that light, when Gaston subsequently arrived on scene at the time suggested by the text messages and telephone conversations in possession of a white bag, which she carried from her vehicle to Hollins', there was ample probable cause that drug evidence would be found therein.

---

[6]More specifically, the Court does not doubt that Hollins requested drugs from Ieremia ("can you drop me off one?"), Ieremia and Hollins later agreed to a larger drug amount (Ieremia: "What I was thinking, was you thinking, uce? Maybe three? Hollins: Um. Well, fuck it. Give me three, man"), and Ieremia arranged for a woman (later identified as Gaston) to meet with Hollins (Alright, uce, she getting the car right now. As soon as she done, she gonna call me, and then, uh, y'all gonna meet up") and deliver the drugs to him ("Everything set I told sus to do it at your job before u get off at 10 rite?).

## CONCLUSION

For the foregoing reasons, Hollins' Motion to Suppress Evidence, Dkt. No. 514, is DENIED.

IT IS SO ORDERED.

DATED: November 1, 2018 at Honolulu, Hawai'i.



Derrick K. Watson
United States District Judge

---

*United States v. Hollins,* Case No. 16-cr-00744-DKW-8; **ORDER DENYING DEFENDANT KPEL HOLLINS' MOTION TO SUPPRESS EVIDENCE**